IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREENWAY CENTER, INC.,**<br>Plaintiff<br><br>v.<br><br>**ESSEX INSURANCE COMPANY**<br>**and ANNETTE MAIONE, individually**<br>**and as administrator of the Estate**<br>**of Mark Willet,**<br>Defendant | No. 3:04cv1143<br><br>(Judge Munley) |

## MEMORANDUM

Before the court for disposition is the plaintiff's complaint, presented to the court in a non-jury trial. The parties have submitted their post-trial briefs, and the matter is thus ripe for disposition. This case involves the operation of a drug and alcohol rehabilitation treatment center, the Greenway Center. The plaintiff is Greenway Center, Inc. (hereinafter "GCI"). GCI is not the same as the Greenway Center, the Greenway Center is the facility, and GCI is a corporation that operated the facility. The defendants are Essex Insurance Company, (hereinafter "Essex") and Annette Maione, individually and as administrator of the Estate of Mark Willet (hereinafter "Maione"). Also involved in the case is Winco Acquisitions, Inc. (hereinafter "Winco"). Winco and GCI both operated the Greenway Center. The main issue in the case is the relationship between Winco and GCI, that is, whether GCI is the successor in interest to Winco. The roles that the various parties play in this case are discussed more fully below.

## Background

The parties do not dispute the following background facts: Greenway

Center[1] is a drug and alcohol detoxification treatment center. On June 23, 1997, Mark Willet was admitted for treatment. The next day, he passed away. Maione brought a negligence cause of action against the plaintiff in the Monroe County Court of Common Pleas in 1999 (hereinafter "underlying state court action") regarding Willet's death.

GCI commenced the instant suit by filing a declaratory judgment action against Essex in the Monroe County Court of Common Pleas. GCI seeks to recover under a general liability insurance policy issued by Essex to Winco Acquisitions, d/b/a Greenway Center. The policy was in effect at the time of events that gave rise to the Estate of Mark Willet lawsuit. Defendant Anne Maione removed the case to this court on May 26, 2004. Defendant Essex asserts that it need not indemnify or provide a defense on the claim because it insured Winco, an entity different from the instant plaintiff, GCI.

The court held a non-jury trial on the matter on April 19, 2005, and issued a decision on July 18, 2005. (Doc. 44). In our decision we concluded that the Pennsylvania court had already determined that a *de facto* merger had been affected between Winco and Greenway. We further determined that issue preclusion prohibited us from revisiting this issue decided by the state court. Accordingly, Greenway entitled to the same rights under the insurance policy as Winco, and Defendant Essex was liable to provide a defense and indemnity with regard to the underlying state court action.

Defendant Essex appealed this decision to the Third Circuit Court of

---

[1] By Greenway Center we refer to the name of the facility not the corporation that ran it.

2

Appeals. The Third Circuit Court of Appeals vacated our judgment in favor of Greenway and remanded the case back to us. The court concluded that issue preclusion did not apply and remanded the case for us to reach the merits of whether Greenway is, under substantive Pennsylvania law, a successor in interest to Winco for the purposes of assuming Winco's liabilities and obtaining rights under its insurance contract with Essex. Greenway Center, Inc. v. Essex Ins. Co., 475 F.3d 139, 152 (3d Cir. 2007). The court indicated that we could take additional evidence or hold such further hearings as we deemed necessary. Accordingly, we held a supplemental non-jury trial on November 14, 2007 to provide the parties the opportunity to submit additional evidence. The transcript has been completed and post-trial briefs have been submitted. The matter is thus now ripe for disposition.

**Jurisdiction**

This Court has jurisdiction pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332. Plaintiff GCI is a Pennsylvania corporation with a principal place of business in Henryville, Pennsylvania, and the Defendant Essex is a corporation with its principal place of business in Glenallen, Virginia. Because we are sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Discussion including findings of fact and conclusions of law[2]**

Plaintiff GCI urges us to rule in its favor on four (4) grounds. First, it

---

[2] We find all of the facts discussed below proven by a preponderance of the evidence presented at the trials.

3

claims that the insurance company is liable because GCI merged with or had a *de facto* merger with the named insured, Winco. Next, plaintiff argues that the right party was sued, but under the wrong designation. Plaintiff's third theory of recovery is that Winco and GCI are not distinct and separate entities but are actually an amalgamation of various "alter egos" put into place to avoid creditors and maximize profits. Thus, the two corporations should be treated as one. Plaintiff's final argument, which is raised for the first time in its post-trial brief, is that under the "reasonable expectations" doctrine, GCI should be covered under the insurance policy. We will address these issues *in seriatim*.

## I. Merger/ *De facto merger*

The underlying issue addressed by the parties is whether Essex is responsible to defend and indemnify GCI in the state court action. Essex asserts that it need not because GCI is not the named insured on the policy. GCI asserts that Essex should provide coverage because it merged with or continued the business of the named insured, Winco. Thus, according to defendant, GCI is entitled to all the rights under the insurance policy that Winco enjoyed.

The issue we must determine as set forth by the Third Circuit Court of Appeals is whether Greenway, under substantive Pennsylvania law, is a successor in interest to Winco for the purposes of assuming Winco's liabilities and obtaining the rights under Winco's insurance contract with Defendant Essex.

Plaintiff GCI can be entitled to the insurance coverage if it is the successor in interest of Winco. Pennsylvania law provides that GCI can be a successor in interest if, *inter alia*, it is consolidated or merged with Winco

or if the business is merely a continuation of Winco. Continental Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005). Thus, we must decide whether the evidence establishes GCI was merely a continuation of or merger with Winco. The Third Circuit Court of Appeals has explained that it is appropriate to treat the continuation and *de facto* merger analysis identically. Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 468 (3d Cir. 2006). The factors we must examine are as follows:

> (1) continuity of ownership;
> (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable;
> (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and
> (4) continuity of the management, personnel, physical location, and the general business operation. Although each of these factors is considered, all need not exist before a de facto merger will be deemed to have occurred.

Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 135 (Pa. Super. Ct. 2002) (internal citations omitted).

To determine whether there has been a merger/*de facto* merger or a continuation of Winco throughout, it is important to outline exactly the chain of events that led from Winco operating Greenway Center to GCI running Greenway Center. Initially, it was Winco that operated Greenway Center as an alcohol and drug rehabilitation center. Under Pennsylvania law, a license is required to run such a center. As a result of the Willet's death, Winco's license was revoked, and Winco shut down the Greenway Center in November 1997 (Notes of Trial Testimony April 19, 2005 (hereinafter "T1") at 18). The center was closed between November 1997 and March 1998. Id.

Previously, on June 15, 1997, Winco had filed for Chapter 11

5

bankruptcy. Pursuant to bankruptcy law, Winco developed a bankruptcy reorganization plan. Under this plan, Winco stock was to be vested or re-issued to GCI. (T1 at 52). Thus, Winco was to transfer all of its stock to GCI.[3] GCI did not, however, buy Winco's assets because Winco did not have any assets to sell. (T1 at 28).

In order to help effectuate the consolidation of Winco and GCI, Health Management Associates (HMA) was created to operate/manage the Greenway Center. (T1 at 20-21). In fact, it was HMA that submitted Winco's bankruptcy reorganization plan. (Notes of Trial Testimony Nov. 14, 2007 (hereinafter "T2") at 13). HMA became the holder of the license to run the business, although the license remained in Winco's name. (T1 at 23-25).[4] In February 1998, HMA assumed management responsibilities for the Greenway Center for Winco. (T2 at 69-70). After this point, no more corporate meetings were held for Winco and it was merely an empty shell. (T2 at 73-75). Accordingly, Greenway Center reopened in March 1998 managed by HMA but still owned by Winco with the aim of eventually turning the business over to GCI.[5]

While it was running the Greenway Center, HMA took no direction from any of the stockholders or owners of Winco. (T1 at 35). On the

---

[3] It is unclear from the record whether this transfer ever officially took place.

[4] The license was eventually transferred to GCI. (T1 at 25). Winco was the license holder of Greenway Center through January 27, 2000. GCI became holder of the license on January 28, 2000. (T2 at 92).

[5] Financing to operate Greenway Center at this point was provided by a company called ViaCare. (T2 at 61). ViaCare, GCI and HMA all had the same board of directors. (T2 at 81-82).

contrary, Nick Salimbene, the president of GCI and HMA made decisions for Winco. (T2, at 71, 46). Eventually the Greenway Center's executive director, Wallace Slatinsky, and others associated with GCI, made decisions for Winco. (T2 at 74).

Most of Winco's employees left when Greenway Center closed down in November 1997. (T2 at 18-19). When it reopened under HMA's management, Greenway Center hired new employees, except for two from the previous administration when Winco was in charge. (T1 at 19).

At the time that the lawsuit was filed, no shareholders or officers of Winco were to be found. They had either moved to parts unknown or were deceased. Regardless, as set forth above, Winco continued to operate, without corporate officers or a board of directors as a "shell" at the same facility as GCI at Greenway Center. (T2 at 75). In fact, HMA still bought insurance in Winco's name when HMA took over the operations of the center even though Winco took no part in running the business, and Winco was running no other facilities at the time. (Id.). (T2 at 35-36).

Although it took no part in running the operations of the Greenway Center after it re-opened, Winco was not dissolved. It was not dissolved because of a state court action filed against it by the Estate of Mark Willet and because it was convenient to allow Winco to remain a party to third party contracts that were serviced by Greenway Center.[6] (T2 at 12). Some of these contracts were with various counties that referred patients to the facility for court-supervised treatment. In order for the counties to send patients to the Greenway Center, the facility had to be approved. In

---

[6]This lawsuit was eventually dismissed on the basis that the statute of limitations had expired. (T2 at 65).

7

order to allow the referrals to continue uninterrupted, the contracts remained in Winco's name. (T2 at 100-101). The contracting parties were not notified that the facility was in fact now run by GCI until the contract term expired. (T2 at 101-102). Winco also had service contracts with outside vendors and continued to have such contracts through the closure of Greenway Center.

In 1998, GCI incorporated in Pennsylvania (T1 at 21). On January 28, 2000, GCI became the holder of the license to run Greenway Center. (T2 at 92). This was nearly two years after HMA began operating the business on Winco's behalf. From 1998 through 2000, the boards of directors of GCI, ViaCare and HMA met regarding Greenway Center's operation. Winco was the named licensee at the time and named insured, but it did not have a board of directors. (T2 83-84).

At all times, whether the facility was operated by Winco, HMA or GCI, or some combination of the three, it was always known as the Greenway Center, the nature of its business did not change and it was always located on the same premises. There was never a change in the letterhead the signs or even the phone number. (T2 at 92-94). The attorney for Winco, HMA and GCI was always the same person. (T2 at 35). In fact the insurance policy at issue continued to name Winco as the insured entity operating Greenway Center - although in fact it was not operating the center. (T1 at 36). Bearing these background facts in mind, we now turn to the merger factors.

The first factor for us to consider is "continuity of ownership." Continental, 873 A.2d at 1291. Some courts have considered this factor to be outcome determinative. If the second corporation does not have the

same shareholders as the initial corporation then there cannot be a *de facto* merger. Berg, 435 F.3d at 469. The Third Circuit, however, has indicated that because the Pennsylvania courts have not specifically adopted this as a bright-line rule, then a full analysis should be done emphasizing the ownership factor, but not relying on it alone. Id. In other words, if this factor is not met, a strong presumption against successor liability arises. Id.

In the instant case, the original corporation had no shareholders or officers remaining when the transfer of operation of the GCI shifted from Winco to GCI. HMA and its officers had in effect been running Winco to the extent that it needed running. The shareholders of HMA are identical to those of GCI. Accordingly, it appears that to a certain extent, there was a continuity of ownership between Winco and GCI.

The second factor in our analysis is cessation of the ordinary business by, and dissolution of, the predecessor corporation as soon as practicable. Continental, 873 A.2d at 1291. In the instant case, Winco has evidently never been officially ended as a corporation. As explained above, Winco was not dissolved because of the state court law suit and because it was convenient to allow Winco to remain a party to third party contracts that were serviced by Greenway Center. With no shareholders, however, Winco was not operating as a business to make money but as a convenience so that the contracts would not have to be renegotiated with various entities. So while Winco never was officially dissolved, it has no shareholders, no business and does nothing. We find, therefore, that for all intents and purposes, it was in fact dissolved as soon as practicable and this factor weighs in finding a *de facto* merger.

9

The third factor for us to analyze is the "assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business" Continental, 810 A.2d at 135. In this case, when the contracts that had been in Winco's name expired, they were entered into by GCI. The contracts remained in Winco's name, but they were carried out by HMA and GCI for the sake of convenience. Hence, this factor weighs in favor of finding a *de facto* merger.[7]

The final factor is whether there is a continuity of the management, personnel, physical location, and the general business operation. In the instant case, it is undisputable that there was a continuity in the physical location and general business operations of the Greenway Center. It was always located at the same site and it always served as an alcohol and drug rehabilitation center. There was also a continuation of management and personnel to a certain extent. During the bankruptcy, the operations of the Greenway Center was taken over by HMA on behalf of the named-insured Winco. This company ran the operations until it was finally taken over by GCI. Evidently, those who ran the operations for Winco prior to the bankruptcy changed during the bankruptcy but did not change when GCI commenced running the operations.

When all these factors are examined, we find a *de facto* merger or continuation.[8] GCI was operated and carried on its business as usual

---

[7]Additionally, no matter what we decide, the Pennsylvania court has already decided that GCI will bear Winco's liability, if any, for the death of Mark Willet. Thus, it has assumed the liability that is most germane in the instant case.

[8]Further, we recognize that this analysis does not precisely fit the case with which we are presented. In the usual case, one company buys

10

through all of the background corporate changes. Although it is unclear what happened to the original shareholders and officers of Winco, it is clear that it eventually was run by HMA and its board of directors. HMA was created merely to effectuate the merger of Winco into GCI. Eventually, GCI did merge with Winco. This is especially true in light of the fact that GCI maintained the insurance in Winco's name even when Winco was clearly doing nothing to operate the business. Winco simply became/merged into GCI.

## II. Correct Plaintiff wrong designation

Next, plaintiff argues that regardless of whether there was a merger, Essex is liable under the insurance policy because in the state court action, the right party was sued, but under the wrong designation. We need not address the substance of this issue. Annette Maione filed suit in Pennsylvania against GCI. The argument is that she sued the right party, but under the wrong designation and that the caption should read that the defendant is GCI "as successor in interest to Winco." GCI, however, is only the successor in interest to Winco if there was a continuation or merger as discussed above. Therefore, we need not address this issue separately.

## III. Alter ego theory

Plaintiff's third theory of recovery is that Winco and GCI are not

---

all the assets of the prior company. In the instant case, Winco had no assets to sell. The consolidation of the businesses was to be performed with a transfer of stock. Apparently, this stock transfer never occurred, perhaps because there were no stockholders left in Winco. Regardless, Winco continued along with HMA and GCI and HMA and GCI are a continuation of the business of Winco.

11

distinct and separate entities but are actually an amalgamation of various "alter egos" put into place to avoid creditors and maximize profits.

Generally, Pennsylvania law provides that "the corporate entity should be upheld, unless specific, unusual, circumstances call for an exception. Care should be taken on all occasions to avoid making the entire theory of corporate entity useless. S.T. Hudson Engineers, Inc. v. Camden Hotel Development Associates, 747 A.2d 931, 935 (Pa. Super. Ct. 2000)(internal quotation marks and citations omitted).

GCI argues that the "alter ego" theory calls for us to "pierce the corporate veil." Under the law, "the *alter ego* theory is applicable only where the individual or corporate owner controls the corporation to be pierced *and the controlling owner is to be held liable.*" Miners, Inc. v. Alpine Equip. Corp., 722 A.2d 691, 695 (Pa. Super. Ct. 1998) (emphasis in original). "That is quite different from the situation whether two or more corporations share common ownership and are, in reality, operating as a corporate combine. This latter theory has been labeled the *enterprise entity* theory or the *single entity* theory." Id. In the instant case, GCI is not attempting to hold the owners of Winco personally liable. Therefore, the claim that they label an "alter ego" claim is inapplicable. In actuality, the theory that GCI advances is the "single entity" theory. This theory, however, has not yet been adopted under Pennsylvania law. Advanced Tele. Sys. Inc. v. Com-Net Professional Mobile Radio, 846 A.2d 1264, 1278 n.9 (Pa. Super. Ct. 2004). Accordingly, we shall not apply it to the instant case where we must apply Pennsylvania law.

### IV. "Reasonable expectations" doctrine

Plaintiff's final argument, which is raised for the first time in its post-

12

trial brief, is that under the "reasonable expectations" doctrine, GCI should be covered under the insurance policy.

The "reasonable expectations" doctrine provides that the "proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903 (3d Cir. 1997). In the instant case, the insurance company denied coverage on the bases that GCI had purchased the assets of Winco and that GCI was not the named insured on the insurance policy. Essex, in plaintiff's opinion, provided insurance to cover the risks associated with the operation of the Greenway Center regardless of the specific corporation operating the facility.

We are unconvinced by plaintiff's argument. The "reasonable expectations doctrine" is concerned with assuring that the public receives something of comparable value in return for insurance premiums it pays. Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920, 926 (Pa. 1987). Thus, "[c]ourts must examine the dynamics of the insurance transaction to ascertain the reasonable expectations of the consumer." Id. This doctrine is inapplicable to the instant case. The issue we are presented with is not an issue involving an exclusion or coverage of the policy. The issue is who the insured party is. The plaintiff was not a party to the insurance contract and was not in existence at the time that the insurance policy was entered into. Therefore, it could not have had an expectation of coverage, unless it obtained this expectation through a merger. The merger arguments are addressed above and we need not re-examine them here. Suffice it to say that the "reasonable expectations" doctrine does not fit the facts of this case, and plaintiff's argument is denied.

13

**Conclusion**

For the reasons set forth above, we find that Plaintiff GCI is merely a continuation of or has merged with Winco. Thus, Defendant Essex is required to provide an indemnity and defense for the underlying state court action.

14

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREENWAY CENTER, INC.,**<br>Plaintiff<br><br>v<br><br>**ESSEX INSURANCE COMPANY**<br>and **ANNETTE MAIONE,**<br>Individually and as<br>Administrator of the<br>**ESTATE OF MARK WILLET,**<br>Defendants | No. 3:04cv1143<br><br>(Judge Munley) |

## VERDICT

**AND NOW**, to wit, this 6th day of August 2008, the Clerk of Court is directed to enter judgment in favor of the plaintiff with regard to the declaratory judgment. We find that Defendant Essex Insurance Company is liable to provide a defense and indemnity to Plaintiff Greenway Center, Inc., involving the Monroe County Court of Common Pleas case number 4776 Civil 1999, <u>Annette Maione, individually and as Administrator of the Estate of Mark Willet v. Greenway Center, Inc. as successor in interest to Winco Acquisitions, Inc.</u> under its insurance policy number 3CA5725.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court

15